UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

DISH NETWORK L.L.C.,
                           Plaintiff,

            - against -

MASSIVE WIRELESS, INC., KHALED
AKHTAR, RAYS IPTV LLC, MUMTAZUR
REHMAN DAUD, and DOES 1-10, d/b/a Glo
TV,

                         Defendants.

---------------------------------------------------------------- x

Case No. 1:23-cv-09071

**COMPLAINT**

Plaintiff DISH Network L.L.C. ("DISH"), by and through its undersigned attorneys, for its Complaint against Defendants Massive Wireless, Inc., Khaled Akhtar ("Akhtar"), Rays IPTV LLC, Mumtazur Rehman Daud ("Daud"), and DOES 1-10, d/b/a Glo TV, alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.       This copyright infringement action arises out of a global pirate television service that is or has been branded to customers in the Eastern District of New York, and throughout the United States, by the names Glo TV, Rays IPTV, and Rays TV (the "Infringing Service").

2.       Defendants Does 1-10 (together the "Direct Infringers") manage and operate the Infringing Service, and, by doing so, knowingly and unlawfully transmit, and publicly perform in the United States, television channels (and the copyrighted programs on those channels) originating from Egypt, Lebanon, Saudi Arabia, India, and Pakistan that are or were exclusively licensed to DISH in the United States.  DISH investigators have observed the Direct Infringers repeatedly infringing DISH's exclusive rights—without authorization from DISH—by continuously streaming in the United States these copyrighted programs through the Infringing Service to service users in this district and throughout the United States (the "Service Users").

3.      While consumers can select from a variety of legal television services (such as those offered by DISH), illegal streaming services (like the Infringing Service) also exist.  Illegal streaming services are able to offer consumers thousands of television channels at a fraction of the cost of legal providers such as DISH, because they do not pay fees to license the content they deliver.  For example, Defendants Rays IPTV LLC and Daud market the Infringing Service to the public by promising "No More Expensive Cable Bills," and targeting consumers "tired of paying too many bills for too little channels."

4.      The Direct Infringers knowingly and unlawfully deliver the Infringing Service to Service Users from computer servers located throughout the world.  The Direct Infringers regularly move their servers to different hosting companies in order to avoid copyright enforcement.

5.      Service Users can access the Infringing Service by using digital TV set-top boxes ("STBs") pre-installed with the Infringing Service.

6.      Defendants Massive Wireless, Inc. and Akhtar, along with Rays IPTV LLC and Daud (together the "Secondary Infringers"), work with the Direct Infringers to promote and enable access to the Infringing Service in the United States.  The Secondary Infringers sell subscriptions to the Infringing Service, as well as STBs preloaded with the Infringing Service, to individual Service Users (and as to Rays IPTV LLC and Daud, to other dealers)—all with actual knowledge that their activities constitute copyright infringement under U.S. law.

7.      Defendants reap substantial profits by infringing DISH's exclusive rights, and they continue to do so despite many emails and takedown demand letters by DISH.  Without intervention from this Court in the form a permanent injunction and significant monetary damages, Defendants will likely continue to promote their illegal scheme with impunity.

## THE PARTIES

8.     Plaintiff DISH Network L.L.C. is a limited liability company organized under the laws of the State of Colorado, with its principal place of business located at 9601 South Meridian Blvd., Englewood, Colorado 80112.

9.     Defendant Massive Wireless, Inc. is a New York corporation with its principal place of business located at 37-51 73rd Street, Jackson Heights, New York 11372.

10.     Defendant Akhtar is an individual residing at 16439 108th Drive, Jamaica, New York 11433.  Akhtar is the CEO and director of Massive Wireless, Inc.

11.     Defendant Rays IPTV LLC is a limited liability company organized under the laws of the State of California with its principal place of business located at 24688 Rio Verde Drive, Ramona, California 92065.

12.     Defendant Daud is an individual residing at 24688 Rio Verde Drive, Ramona, California 92065.  Daud is the CEO of Rays IPTV LLC.

13.     The Doe Defendants are additional individuals or entities doing business as Glo TV. The Doe Defendants take elaborate steps to conceal their identities, and consequently, DISH does not currently know their names.

## JURISDICTION AND VENUE

14.     DISH asserts claims under the Copyright Act, 17 U.S.C. § 101 *et seq.*  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338.

15.     Personal jurisdiction over Defendant Massive Wireless, Inc. is proper, because it is a New York corporation headquartered in this district.

16.     Personal jurisdiction over Defendant Akhtar is proper because he lives and works in this district.

17.     Personal jurisdiction over Defendants Rays IPTV LLC and Daud is proper because they each purposefully direct their conduct to New York (*e.g.*, distributing the Infringing Service and STBs preloaded with the Infringing Service to customers in this state, including to Massive Wireless).  Defendants Rays IPTV LLC and Daud thus purposefully avail themselves of the privileges of conducting business activities within this state, and have caused injury to DISH in this state.  Defendants Rays IPTV LLC and Daud also derive substantial revenue from the sale in this state of STBs preloaded with the Infringing Service.

18.     Personal jurisdiction over Defendants Does 1-10 is proper, as they have each purposefully directed their conduct towards, and have purposefully availed themselves of, the privileges of conducting business activities within this state by, among other things, transmitting, selling, and supplying the Infringing Service to Service Users in the Eastern District of New York, causing injury to DISH in this state and in this district.  Alternatively, to the extent that any Doe Defendant is not subject to personal jurisdiction in any state's courts of general jurisdiction, the exercise of personal jurisdiction over that defendant is proper pursuant to Fed. R. Civ. P. 4(k)(2), because DISH's claims arise under federal law, and the exercise of jurisdiction is consistent with the United States Constitution and United States law.  Defendants Does 1-10 also derive substantial revenue from the use in this state and this district of STBs preloaded with the Infringing Service.

19.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1)-(3) because Massive Wireless, Inc. and Akhtar reside in this judicial district, a substantial part of the events causing DISH's claims occurred in this district, and because Defendants are subject to personal jurisdiction in this district.  Venue is also proper under § 1391(c)(3) because, upon information and belief, the Doe Defendants are nonresidents in the United States who may be sued in any judicial district.

Venue is also proper in this Court under 28 U.S.C. § 1400(a) because the case involves violations of the U.S. Copyright Act.

## FACTUAL BACKGROUND

### A.   DISH's Copyrights

20.    Plaintiff DISH is the fourth largest pay-tv provider in the United States, providing copyrighted programming to millions of subscribers nationwide.  DISH is also one of the largest providers of international television channels in the United States, offering more than 390 channels in 26 languages.

21.    DISH contracts for and licenses rights for works aired on the international channels distributed on its platform from channel owners and their agents, including B4U U.S.; Bennett, Coleman and Company Limited; GloboSat Entertainment LLC; International Media Distribution (Luxembourg) S.A.R.L.; MSM Asia Limited; Soundview ATN LLC; Soundview Broadcasting LLC; and World Span Media Consulting, Inc. (collectively, the "Networks").

22.    The Networks' channels include Al Hayah 1 (a/k/a Al Hayat 1); ART Aflam 1; ART Aflam 2; ART Cima; ATN Bangla; ATN News; B4U Movies; CBC; CBC Drama; Future TV; LBC; LBCI (a/k/a LDC); Melody Classic; NTV Bangla; SAB; Sahara One; SET (a/k/a Sony SET); SET MAX; Times Now; and Zoom (collectively, the "Protected Channels").  The Networks acquire copyrights in the works that air on their respective channels, including by creating the works and by assignment.

23.    DISH entered into signed, written license agreements with the Networks granting DISH the exclusive rights to distribute and publicly perform the copyrighted works that appear on the Protected Channels in the United States (the "Works") by means including satellite, over-the-

top ("OTT"),[1] IPTV, and internet.[2] DISH's exclusive rights to distribute and publicly perform the Works were in effect at all times relevant to this lawsuit.[3] Many of the Works that aired on the Protected Channels are registered with the U.S. Copyright Office. *See* **Exhibit 1** (list of 170 Registered Works.) There are also a vast number of programs that aired on the Protected Channels whose episodes are each copyrighted Works to which DISH holds or held exclusive distribution and public performance rights and for which not all episodes have been registered with the U.S. Copyright Office. *See* **Exhibit 2**.[4]

24.     Defendants have not been and currently are not authorized by DISH to transmit, distribute, or publicly perform the Protected Channels or the Works in the United States, and Defendants have paid no compensation to DISH in connection with the unlicensed transmission and public performance in the United States of the Protected Channels or the copyrighted programs that air on those channels.

**B.     The Direct Infringers' Unlawful Conduct**

25.     The Direct Infringers knowingly and unlawfully transmit, carry, and publicly perform in the United States the Protected Channels (and the Works) via the Infringing Service.

---

[1] "An over-the-top media service is a media service offered directly to viewers via the Internet. OTT bypasses cable, broadcast, and satellite television platforms—the types of companies that have traditionally acted as controllers or distributors of such content." https://en.wikipedia.org/wiki/Over-the-top_media_service (last visited Dec. 6, 2023).

[2] "Internet Protocol television (IPTV) is the delivery of television content over Internet Protocol (IP) networks. This is in contrast to delivery through traditional terrestrial, satellite, and cable television formats. Unlike downloaded media, IPTV offers the ability to stream the source media continuously." https://en.wikipedia.org/wiki/Internet_Protocol_television (last visited Dec. 6, 2023).

[3] DISH's exclusive rights as to the Protected Channels are currently in effect, with the exception of International Media Distribution (Luxembourg) S.A.R.L., for which DISH's exclusive rights expired on November 29, 2023.

[4] Since the programs that make up the Protected Channels are non-United States works, registration with the United States Copyright Office is not a prerequisite to filing a copyright infringement action with respect to these works. 17 U.S.C. §§ 101 and 411. *See infra* ¶ 58.

Without authorization from DISH, the Direct Infringers take broadcasts of these copyrighted works soon after the original, authorized transmissions, transfer them to one or more computer servers under their control, and then transmit them to Service Users through the Infringing Service using OTT delivery.

26.     The Direct Infringers carry and market the Infringing Service in two ways:  by making the Infringing Service available to retail stores for resale to Service Users; and directly to individual Service Users.  In other words, the Direct Infringers are both wholesalers and retailers of the Infringing Service.

27.     As part of their wholesale operation, the Direct Infringers coordinate with individual retailers to sell subscriptions to the Infringing Service and STBs preloaded with the Infringing Service.  To facilitate these sales, the Direct Infringers provide retailers with access to an online reseller panel (the "Reseller Panel") that allows the retailer to (among other things) activate and deactivate subscriptions to the Infringing Service, provide free trials of the Infringing Service to customers, and to purchase additional subscriptions from the Direct Infringers, which the retailer can then resell to its customers.

28.     For their retail operation, the Direct Infringers also allow Service Users to access the Infringing Service directly, without going through a third-party retailer.  Any Service User with internet access can access the Infringing Service by simply purchasing a subscription from Defendants, connecting an Android device to a television or monitor,[5] installing an application that is enabled to access the Infringing Service, and entering their subscription information.

---

[5] Other devices such as MAG STBs, Firesticks, and Smart TVs can similarly be configured with the Infringing Service.

**C.     DISH's Investigation Into Daud and Rays IPTV LLC**

29.     Defendants Daud and Rays IPTV LLC (together "Rays") sell and market the Infringing Service directly to Service Users through websites and by telephone.  Rays also sells STBs preloaded with the Infringing Service to other retailers (including Massive Wireless).

30.     Rays markets and brands the Infringing Service as, alternatively, Glo TV, Rays IPTV, and Rays TV.  Though Rays sometimes rebrands the Infringing Service using different names, testing conducted by DISH investigators confirms that, since Glo TV and Rays IPTV/TV direct to the same authentication/authorization server, they are simply different brand names for the exact same service:  the Infringing Service.[6]

**Figure 1.  Rays IPTV Marketing**



31.     As set forth in Figure 1 (above), Rays promoted the Infringing Service on the

_____

[6] Rays also sells and markets other infringing services that are not at issue in this lawsuit.

website Raysiptv.com claiming it is the "Best IPTV Service since 2010."  Rays targeted consumers "tired of paying too many bills for too little channels" and promised potential customers that with the "Rays IPTV" Service (a brand name for the Infringing Service) there would be "No More Expensive Cable Bills," they would "Get Over 4,500 Ordinary & Premium Channels Instantly," and they "can now watch all channels from the globe."  Rays also offered a "48 Hour Trial for Free."

32.    Rays sold the Infringing Service on its website Raysiptv.com with a one-month subscription for approximately $65 and a twelve-month subscription for approximately $305.

33.    Rays also promoted the Infringing Service on the website Dauditl.com stating, "RAYS IPTV can be purchased by visiting or calling Our office: (619) 450-4131."

**Figure 2:  Rays TV Home Screen**



34.    Rays preloads the Infringing Service onto its own STBs, which are specially engraved with its "Rays TV" brand.  Rays sells these STBs to Service Users, and also sells them

to other dealers for resale. Figure 2 (above) shows the home screen of the Infringing Service, accessed by using a Rays TV-branded STB, which is sold and promoted by Rays (and its retailers such as Massive Wireless), identifying Daud IT Ltd. as the provider and Rays TV as the name for the app.

35.     Rays has access to an online Reseller Panel that allows it to activate and deactivate subscriptions to the Infringing Service. Upon receiving a purchaser's name and the Media Access Control Address ("MAC Address") found on the bottom of their STB, Rays activates the Infringing Service for that Service User for the length of time corresponding with the subscription purchased. Once a subscription is activated, that Service User selects the Rays TV app to access the Infringing Service, selects the Protected Channels, and watches the copyrighted works that air on those channels.

**D. DISH's Investigation Into Massive Wireless and Akhtar**

36.     Defendants Massive Wireless, Inc., and Akhtar (together "Massive Wireless") sell and promote subscriptions to the Infringing Service, as well as STBs preloaded with the Infringing Service. Massive Wireless markets the Infringing Service as "Rays TV," and operates a storefront location at 37-51 73rd Street, Jackson Heights, New York 11372.

37.     Massive Wireless has a long history of selling and promoting unauthorized services that carry copyrighted works exclusively licensed to DISH in the United States. Moreover, Massive Wireless has consistently disregarded DISH's repeated written demands that they cease those activities.

38.     For example, a DISH investigator visited Massive Wireless's retail store in August 2017, and confirmed that Massive Wireless was offering for sale other infringing services that transmit channels exclusively licensed to DISH. Following that visit, DISH sent Massive

Wireless an infringement notice on August 23, 2017, listing the channels exclusively licensed to DISH that were being unlawfully transmitted by other infringing services sold and marketed by Massive Wireless. DISH enclosed judgments and permanent injunctions against the operators and retailers of these services and demanded that Massive Wireless cease distributing, providing, or promoting these or any other services that infringe DISH's exclusive rights. Massive Wireless ignored DISH's demand and continued to carry, sell, provide, and promote services that unlawfully provide access to DISH's copyrighted channels in the United States.

39. An investigator visited Massive Wireless's retail store in July 2021 and confirmed that Massive Wireless was offering to sell the Infringing Service. Massive Wireless is itself a customer of Rays and purchases subscriptions to the Infringing Service that are branded by Rays as "Rays TV" and sells STBs from Rays that are preloaded with the Infringing Service.

40. DISH sent Massive Wireless a second infringement notice on July 27, 2021, listing the Protected Channels that were being transmitted and publicly performed in the United States via the Infringing Service. DISH enclosed two more judgments and permanent injunctions against the operators and retailers of similar unauthorized STBs and services, and renewed its demand that Massive Wireless cease distributing, providing, or promoting all STBs and services that transmit the Protected Channels to users in the United States without authorization from DISH. Once again, Massive Wireless ignored DISH's demand.

41. A DISH investigator visited Massive Wireless's retail store again in March 2023, and confirmed that Massive Wireless was still selling and promoting the Infringing Service (branded as "Rays TV") and STBs preloaded with the Infringing Service. During this visit, a Massive Wireless salesman offered to sell DISH's investigator a three-month subscription to the Infringing Service (branded as "Rays TV") for $110, or a twelve-month subscription for $240.

The investigator purchased the 12-month subscription for $240.  As reflected in Figure 3 (below), Massive Wireless provided a receipt for the March 2023 transaction (shown here with the investigator's identifying information redacted).

**Figure 3:  Massive Wireless Receipt for March 2023 Sale of the Infringing Service**



42.     A DISH investigator contacted Massive Wireless via text message for activation of the subscription purchased in March 2023.  The investigator provided the purchaser's name and MAC Address found on the bottom of the STB.  Massive Wireless then activated the subscription using Massive Wireless's Reseller Panel.   Once activated by Massive Wireless, DISH's investigator was able to use the STB to access the Infringing Service and was able to the view the Protected Channels.

43.     DISH sent Massive Wireless a third notice of infringement on May 5, 2023, listing the Protected Channels being transmitted in the United States by the Infringing Service.  DISH enclosed six judgments and permanent injunctions entered against operators and retailers of similar unauthorized streaming services and STBs, and again demanded that Massive Wireless cease to

carry, sell, provide, or promote the Infringing Service, and any other STBs or services that provide access to the Protected Channels in the United States. Massive Wireless did not respond to DISH's demand, and it continues to distribute, sell, provide, and promote the Infringing Service.

44.    A DISH investigator visited Massive Wireless's retail store again in June 2023 and confirmed that Massive Wireless continued to sell the Infringing Service. Photographs taken by the investigator who visited Massive Wireless in June 2023, show the box containing the "Rays TV" STB being opened by the salesman. *See* Fig. 4 (below).

**Figure 4:  Massive Wireless Employee Selling STB Preloaded With Infringing Service**

 

45.    The Massive Wireless salesman stated to DISH's investigator that the Infringing Service included access to the Sony SET channel (one of the Protected Channels), and could be purchased for $260. Massive Wireless sold the DISH investigator a Rays TV-branded STB preloaded with the Infringing Service, as well as a subscription to the Infringing Service, for $260. As reflected in Figure 5 (below), Massive Wireless provided a receipt for the June 2023 transaction (shown here with the investigator's identifying information redacted).

**Figure 5:  Massive Wireless Receipt for June 2023 Sale of the Infringing Service**



46.     A DISH investigator contacted Massive Wireless via telephone to activate the Rays TV-branded STB preloaded with the Infringing Service that was purchased from Massive Wireless in June 2023, by providing the purchaser's name and the MAC Address found on the bottom of the STB.  To confirm that the subscription had been activated, the Massive Wireless salesman sent DISH's investigator a screenshot from Massive Wireless' Reseller Panel, showing the "active" status of the investigator's subscription.

47.     Once activated, the DISH investigator was able to access the Infringing Service, including the Protected Channels.  As of the filing of this Complaint, the DISH investigator continued to be able to access the Protected Channels by accessing the Infringing Service using the STB purchased from Massive Wireless in June 2023.

48.     Additional notices of infringement were sent to Massive Wireless on July 6, 2023, August 16, 2023, and August 24, 2023, listing the Protected Channels being transmitted in the

14

United States by the Infringing Service and demanding that Massive Wireless cease providing access to the Infringing Service.  Massive Wireless did not respond to these written demands.

49.     A DISH investigator called Massive Wireless in September 2023 and confirmed that it was still offering to sell the Infringing Service and that the Infringing Service still continuously streams the Protected Channels.

**E.     Defendants' Infringement is Willful and Defiant**

50.     DISH has repeatedly demanded that the Defendants cease their unlawful activity, but Defendants have refused to do so.

51.     DISH sent Rays two infringement notices on August 7, 2023, and August 16, 2023, listing the Protected Channels airing the Works.  DISH enclosed six judgments and permanent injunctions entered against operators and retailers of similar unauthorized streaming services and STBs.  The notices demanded that Rays deactivate all active subscriptions to the Infringing Service, and that it cease to carry, sell, provide, or promote the Infringing Service, and all other services or STBs that provide access to the Protected Channels or the Works in the United States.

52.     On August 17, 2023, Daud responded on behalf of Rays, falsely claiming that he would "take care of it," and that he had "already stopped any streaming" of the Infringing Service. In fact, Daud did not deactivate any subscriptions to the Infringing Service.  Subscriptions to the Infringing Service purchased from Rays remain active as of the filing of this Complaint.

53.     As of the filing of this Complaint, Rays continues to carry, transmit, publicly perform, market, and promote the Infringing Service, with actual knowledge that by doing so it is infringing DISH's exclusive rights under the Copyright Act.

54.     As detailed above, DISH also sent multiple cease-and-desist notices to Massive Wireless, but Massive Wireless ignored those notices and continues its infringing activities.

Massive Wireless also has actual knowledge that the transmission and public performance of the Works on the Infringing Service infringes DISH's copyrights.

55.     The Direct Infringers also have actual knowledge that the transmission and public performance of the Infringing Service infringes the Works.  DISH and the Networks sent at least 20 notices of infringement to content delivery networks ("CDNs") used by the Doe Defendants associated with the Infringing Service from May 28, 2021, to the filing of this Complaint, requesting the removal of the Protected Channels and the copyrighted works that air on those channels.  At least some notices of infringement that DISH and the Networks sent to CDNs were forwarded to the Direct Infringers, as confirmed by the CDNs, which told DISH, "[t]he report was forwarded to our customer" and "[i]t has been forwarded to the respective user of the specified IP address(es) along with an order to cease and desist."  Even when these CDNs removed the unauthorized content, the Direct Infringers intentionally interfered with the takedown efforts by, for example, transmitting the Infringing Service from different CDNs or locations.  The Direct Infringers have not responded to DISH or the Networks concerning any of the notices of infringement.

**CLAIMS FOR RELIEF**

**COUNT ONE**
**Direct Copyright Infringement Against the Direct Infringers**

56.     DISH repeats and realleges the allegations in paragraphs 1-55.

57.     DISH is a copyright owner under 17 U.S.C. § 106 because DISH holds or held at the relevant times the exclusive right to transmit, distribute and publicly perform in the United States the Works, by means including satellite, OTT, IPTV, and internet.

58.     The Works are original audiovisual works fixed in a tangible medium of expression, and are therefore copyrightable subject matter.  DISH's copyrights in the Works arise under laws

of nations other than the United States that are parties to copyright treaties with the United States, including Egypt, Lebanon, Saudi Arabia, India, and Bangladesh, where the Works were authored and first published. Under 17 U.S.C. §§ 101, 411, the Works are non-U.S. works, and therefore registration with the U.S. Copyright Office is not a prerequisite to filing a copyright infringement action. Nonetheless, as shown on Exhibit 1, several of the Works have been registered with the U.S. Copyright Office.

59.    Without permission from DISH, the Direct Infringers infringe DISH's exclusive rights in the Works by transmitting and publicly performing the Works in the United States through the Infringing Service (using servers controlled by the Direct Infringers), thereby infringing DISH's exclusive rights under 17 U.S.C. § 106.

60.    At all times relevant to this Complaint, the Direct Infringers had actual knowledge that their actions infringe DISH's exclusive rights with respect to the Works.

61.    The infringement of DISH's rights in each copyrighted Work constitutes a separate and distinct act of copyright infringement.

62.    The Direct Infringers are jointly and severally liable for each act of infringement described above because they personally directed, authorized, supervised, or participated in, and financially benefited from, such infringing conduct as alleged herein.

63.    The Direct Infringers' actions are willful, malicious, intentional, and purposeful, and in disregard of and with indifference to DISH's rights.

64.    Unless enjoined by the Court, the Direct Infringers will continue to engage in acts causing substantial and irreparable injury to DISH that includes lost sales, damage to its reputation, and loss of goodwill, for which there is no adequate remedy at law.

## COUNT TWO
## Contributory Copyright Infringement Against The Secondary Infringers

65.     DISH repeats and realleges the allegations in paragraphs 1-64.

66.     As set forth above, DISH's exclusive rights with respect to the Works in the United States are directly infringed by the Direct Infringers' unauthorized transmission and public performance of the Works.

67.     The Secondary Infringers intentionally induce, encourage, and assist this direct infringement, and each contributorily infringes DISH's exclusive rights under 17 U.S.C. § 106 by, among other things, facilitating Service Users' access to the Works in the United States.

68.     The Secondary Infringers knowingly and materially contribute to the direct infringement described above by, among other things, providing Service Users with access to the Works, despite having the knowledge and ability to prevent such access via simple measures to stop or limit infringement.  The Secondary Infringers also induce the infringement of DISH's exclusive rights by, among other things, knowingly creating or expanding the audience for that infringement in the United States.  They do so by selling and marketing subscriptions to the Infringing Service and STBs preloaded with the Infringing Service.

69.     The Secondary Infringers intend that the Infringing Service be used to access the Works, and they promote, encourage, and facilitate using the Infringing Service in this manner. They do so with actual knowledge that the Infringing Service infringes DISH's exclusive rights as to the Works.

70.     The Secondary Infringers' actions are willful, malicious, intentional, purposeful, and in disregard of and with indifference to the rights of DISH.

71.     Unless enjoined by the Court, the Secondary Infringers will continue to engage in acts causing substantial and irreparable injury to DISH that includes lost sales, damage to its reputation, and loss of goodwill, for which there is no adequate remedy at law.

## COUNT THREE
## Vicarious Copyright Infringement Against the Secondary Infringers

72.     DISH repeats and realleges the allegations in paragraphs 1-64.

73.     As set forth above, DISH's exclusive rights with respect to the Works are directly infringed by the Direct Infringers' unauthorized transmission and public performance of the Works in the United States.

74.     The Secondary Infringers have the right and ability to control the direct infringement, but they decline to do so.  For example, the Secondary Infringers control access to the Infringing Service by selling subscriptions and STBs preloaded with the Infringing Service, and through the Reseller Panel, they have the ability to activate or deactivate their customers' subscriptions to the Infringing Service at any time.  Refusing to activate their customers' subscriptions would prevent the transmission and public performance.  Deactivating their customers' subscriptions would stop the transmission and public performance.

75.     Yet even after receiving DISH's numerous cease-and-desist notices, the Secondary Infringers continually failed to exercise their right and ability to control the infringement of DISH's exclusive rights.

76.     The Secondary Infringers receive a direct financial benefit from the Infringing Service and the Direct Infringers' continued transmission and public performance of the Works. The Secondary Infringers receive direct payments from Service Users who purchase subscriptions to the Infringing Service and STBs preloaded with the Infringing Service, and Rays also receives direct payments from retailers like Massive Wireless that pay Rays for subscriptions and STBs.

19

77. The Secondary Infringers' actions are willful, malicious, intentional, purposeful, and in disregard of and with indifference to the rights of DISH.

78. Unless enjoined by the Court, the Secondary Infringers will continue to engage in acts causing substantial and irreparable injury to DISH that includes lost sales, damage to its reputation, and loss of goodwill, for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, DISH prays for judgment against Defendants as follows:

a) Permanently enjoining Defendants and their officers, agents, servants, and employees, and all those acting in active concert or participation with them, from (i) distributing, publicly performing, and/or in any way transmitting video content in which DISH holds exclusive rights, including the Protected Channels and the Works; (ii) inducing, encouraging, causing, facilitating, and/or materially contributing to the unauthorized distribution, public performance, and/or transmission by others of the Protected Channels and the Works; (iii) distributing, selling, advertising, marketing, or promoting the Infringing Service, or any other service that contains, connects to, offers for download, transmits, assists in the transmission of, streams, hosts, provides access to, or otherwise distributes or publicly performs, or displays directly or indirectly, by means of any device or process, any of the Protected Channels and Works; or (iv) enabling, assisting, or consulting with other persons or entities to do any of the activities described in (i)-(iii) above, including by selling, leasing, licensing, assigning, conveying, distributing, loaning, encumbering, pledging, or otherwise transferring, whether or not for consideration or compensation, any part of their infringing operations;

b) Permanently enjoining Defendants from distributing, providing, promoting, and/or selling set-top boxes and services that transmit, distribute, or publicly perform the Protected

20

Channels or the Works in the United States or otherwise provide to users in the United States access to the Protected Channels or the Works;

c)       For the 170 Registered Works listed in Exhibit 1, statutory damages up to $150,000 per Registered Work infringed under 17 U.S.C. § 504(c), or the Defendants' profits attributable to the infringement of those Registered Works under 17 U.S.C. § 504(b);

d)       For unregistered Works, an award of Defendants' profits attributable to the infringement of each unregistered Work under 17 U.S.C. § 504(b);

e)       Awarding DISH its costs of prosecuting this action, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505;

f)       Awarding DISH prejudgment interest and post-judgment interest at the highest legal rate allowed under law;

g)       For an order permanently transferring each domain name that Defendants used in connection with the infringement (including, but not limited to Glotv.me, Dauditl.com, and Raysiptv.com) to DISH, and enjoining any hosting company from supporting the Infringing Service or any other service used to access channels exclusively licensed to DISH.

h)       Directing Defendants to file with this Court within 30 days after the entry of final judgment a written statement, under oath, setting forth in detail the manner in which they have complied with the Judgment of the Court; and

i)    Awarding DISH such other and further relief as this Court deems just, proper, and equitable.

Dated:  December 13, 2023

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By:    _/s/ Robert D. Balin_

Robert D. Balin
Adam I. Rich
1251 Avenue of the Americas
21st Floor
New York, NY 10020
Tel. 212.489.8230
Email:  robertbalin@dwt.com
        adamrich@dwt.com

_Attorneys for Plaintiff DISH
Network L.L.C._