UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
DISH NETWORK L.L.C.,
                              Plaintiff,

                                                                    **MEMORANDUM AND ORDER**
              -against-                                              23-CV-09071 (OEM) (TAM)

MASSIVE WIRELESS, INC., KHALED AKHTAR,
RAYS IPTV LLC, MUMTAZUR REHMAN DAUD,
and DOES 1-10, d/b/a Glo TV,

                              Defendants.
-----------------------------------------------------------------x

ORELIA E. MERCHANT, United States District Judge:

On December 12, 2023, Plaintiff DISH Network L.L.C. ("DISH") commenced this action against Defendants Massive Wireless, Inc. ("Massive Wireless"), Khaled Akhtar ("Akhtar"), Rays IPTV LLC ("Rays IPTV"), Mumtazur Rehman Daud ("Daud"), and Does 1-10, d/b/a Glo TV ("Doe Defendants") (Massive Wireless, Akhtar, Rays IPTV, Daud, and Doe Defendants collectively "Defendants"). *See generally* Complaint, Dkt. 1 ("Complaint" or "Compl."). DISH alleges that Defendants violated the Copyright Act, 17 U.S.C. §§ 101 *et seq.* ("Copyright Act"). Specifically, DISH alleges that Massive Wireless engaged in a brick-and-mortar global pirate television service that infringed on DISH's copyrights by transmitting television channels originating in India, Bangladesh, and the Middle East to customers in the United States through the use of set-top Android boxes preloaded with the service. *See generally* Compl. DISH alleges causes of action for direct, contributory, and vicarious copyright infringement in violation of DISH's rights under 17 U.S.C. § 106. *Id.* ¶¶ 56-78.

Before the Court is DISH's motion for partial summary judgment, preliminary injunction, and attorneys' fees and costs against Massive Wireless and Akhtar.[1]  For the following reasons, DISH's motion for partial summary judgment and preliminary injunction is granted, and DISH is granted leave to file its motion for attorneys' fees and costs.

## BACKGROUND

### A.  The Parties

DISH is a Colorado limited liability company.  Pl.'s Rule 56.1 ¶ 2.  DISH is a TV program provider and "offers hundreds of channels in a large number of different languages" to "millions of subscribers nationwide."  *Id.* ¶¶ 3-4.

Massive Wireless is a New York corporation.  *Id.* ¶ 5.  It "operates an electronics store in Jackson Heights, New York, called Massive Wireless" and has done so since 2014.  *Id.* ¶¶ 6-7.

Akhtar, the sole owner and CEO of Massive Wireless, resides in New York.  *Id.* ¶¶ 8-9.

### B.  The Copyrights

DISH has contracts and exclusive licenses from "various foreign television channel owners and their agents" which permits DISH to "air the channel owners' television programs on DISH's platform."  *Id.* ¶ 15.  Relevant to the instant proceedings, DISH has contracts with B4U U.S., Bennett, Coleman and Company Limited, GloboSat Entertainment LLC, International Media Distribution (Luxembourg) S.A.R.L., MSM Asia Limited, Soundview ATN LLC, Soundview Broadcasting LLC, and World Span Media Consulting, Inc. ("Networks").  *Id.* ¶ 16.  The Networks

---

[1] *See* Memorandum of Law in Support of DISH Network L.L.C.'s Motion for Partial Summary Judgment and a Permanent Injunction Against Defendants Massive Wireless Inc. and Khaled Akhtar, Dkt. 41 ("Motion" or "Mot."); Local Civil Rule 56.1 Statement of Material Facts as to Which There Is No Genuine Issue To Be Tried In Support of DISH's Motion for Partial Summary Judgment, Dkt. 42 ("Pl.'s Rule 56.1"); Defendants' Opposition to Plaintiffs' Motion, Dkt. 39 ("Opposition" or "Opp'n"); Defendants' Statement Controverting Plaintiff's Material Facts, Dkt. 29 ("Defendants' Rule 56.1 Response" or "Defs.' Rule 56.1 Resp."); Reply Memorandum of Law in Further Support of DISH Network L.L.C.'s Motion for Partial Summary Judgment and a Permanent Injunction, Dkt. 46 ("Reply").

host television channels including A1 Hayah 1 (a/k/a A1 Hayat 1), ART Aflam 1, ART Aflam 2, ART Cima, ATN Bangla, ATN News, B4U Movies, CBC, CBC Drama, Future TV, LBC, LBCI (a/k/a LDC), Melody Classic, NTV Bangla, SAB, Sahara One, SET (a/k/a Sony SET), SET MAX, Times Now, and Zoom ("Channels"). *Id.* ¶ 17.

DISH entered into written licensing agreements with each of the Networks, which granted DISH the exclusive right to distribute and publicly perform the Channels and works that air on the Channels ("Works") in the United States. *Id.* ¶ 20. DISH's exclusive rights to distribute and publicly perform the Works were in effect "at all times relevant to this lawsuit." *Id.* ¶ 21.

"The Networks acquire copyrights in the Works that air on their respective channels, including by creating the works and by assignment." *Id.* ¶ 22. One hundred seventy of the Works are registered with the U.S. Copyright Office "all of which aired on the [Channels] between January 2021, and October 2023." *Id.* ¶ 23; *see* Declaration of Elizabeth Riemersma in Support of DISH's Motion for Partial Summary Judgment ¶ 9, Dkt. 43 ("Riemersma Declaration" or "Riemersma Decl."); *id.*, Exhibit A at 2-171, Dkt. 43-1 ("Certificates of Registration") (attaching certificates of registration issued by the U.S. Copyright Office for each of the Works that are registered). There are "[a] vast number of the Works" which are copyrighted and for which DISH "holds or held exclusive distribution and public performance rights," but which are not registered with the U.S. Copyright Office. Pl.'s Rule 56.1 ¶ 24; Riemersma Decl. ¶ 10.

### C. The Alleged Infringement

In 2021, DISH became aware of a pirate television service that operates under the brand names "Glo TV" and "Rays TV" and provides access to the Channels in the United States without authorization from DISH ("Service"). Pl.'s Rule 56.1 ¶¶ 27-29; Riemersma Decl. ¶¶ 13-15. Once a customer purchases a subscription to the Service, thereby becoming a Service User, they could

3

"access the [Channels and the Works] via a digital TV set-top box that utilizes the Android operating system."  Pl.'s Rule 56.1 ¶ 29.  DISH launched an ongoing investigation to monitor the Service.  *Id.* ¶¶ 27, 30.  Through its investigation and monitoring, DISH "determined that, without permission from DISH, the [Service] transmits the [Channels] (including the Works) to Service Users on a continuous basis, 24 hours per day, and 7 days a week."  *Id.* ¶ 33.

"In September 2020, Massive Wireless and Akhtar began purchasing Rays TV boxes from Daud" and Massive Wireless began selling Rays TV in October 2020.  *Id.* ¶¶ 41, 48.  Massive Wireless purchased a certain number of credits from Daud; one credit provided one month of service for one Rays TV set-top box.  Declaration of Adam Rich in Support of DISH's Motion for Partial Summary Judgment ("Rich Decl."), Exhibit C at 105, Dkt. 45-3 ("Akhtar Deposition Excerpts").  Massive Wireless sold the Rays TV set-top boxes preloaded with the Service together with a subscription to the Service.  Pl.'s Rule 56.1 ¶ 49.  Massive Wireless charged customers between $200 and $240 for the set-top box and a one-year subscription.  Akhtar Deposition Excepts at 107.[2]  Massive Wireless did not stop selling the Rays TV boxes until December 2023.  *Id.* ¶ 55.  "Massive Wireless sold Rays TV set-top boxes to its customers for the purpose of enabling those customers to 'access' the [Service]."  *Id.* ¶ 54.  DISH did not give Massive Wireless or Akhtar license or permission that granted them rights of any kind to the Service.  *Id.* ¶ 64.

Akhtar purchased the Rays TV set top boxes from Daud in bulk and directed Daud to ship those boxes to his home every 5-6 months.  *Id.* ¶¶ 41, 46-47.  "Akhtar personally made the decision to start selling the [Service] to 'grow [his] business.'"  *Id.* ¶ 45.  Akhtar promoted the Service by including a Rays TV logo on his business card as CEO of Master Wireless.  *Id.* ¶ 63.  Massive

---

[2] DISH contends that Massive Wireless sold the boxes, Service, and subscription "for anywhere from $210-$480 each" but cites to Akhtar's deposition transcript, where he states that he charged customers for the Rays TV service "in between [$]200 to $240."  Pl.'s Rule 56.1 ¶ 50; Akhtar Deposition Excerpts at 107.

Wireless and Akhtar had access to the reseller panel which allowed Akhtar to activate or deactivate customers' access to the Service. *Id.* ¶¶ 113-18. Master Wireless generated revenues from its sales of Rays TV and Akhtar takes 100 percent of the profits generated by Massive Wireless. *Id.* ¶¶ 111-12.

Between 2017 and 2023, DISH sent six cease-and-desist notices to Massive Wireless and Akhtar, "notifying them that they were infringing DISH's copyrights . . . and demanding that Massive Wireless and Akhtar cease and desist from sales or promotion of the [Service], or any other service that transmits channels that are exclusively licensed to DISH." *Id.* ¶¶ 89-110. On August 23, 2017, the first cease-and-desist notice was sent via U.S. Postal Service Certified Mail and by email to massivewireless@gmail.com. *Id.* ¶ 91. The letter "demanded that Massive Wireless and Akhtar stop selling and promoting a different service, called Shava TV, which was unlawfully transmitting channels exclusively licensed to DISH." *Id.* ¶ 94. DISH received a "green card" from the U.S. Postal Service confirming that the August 23, 2017, letter was delivered to Massive Wireless and Akhtar. *Id.* ¶¶ 96-99. On July 27, 2021, DISH sent a second cease-and-desist letter to Massive Wireless and Akhtar via U.S. Postal Service Certified Mail and received a green card from the Postal Service confirming that it was delivered to Massive Wireless. *Id.* ¶¶ 100, 102. On May 5, 2023, DISH sent a third cease-and-desist letter to Massive Wireless and Akhtar via U.S. Postal Service Certified Mail, which Akhtar and Massive Wireless received. *Id.* ¶¶ 104-05; Rich Decl., Exhibit J, Dkt. 45-10 ("May 5, 2023, Cease-and-Desist Letter"); Defs.' Rule 56.1 Resp. ¶ 105. On July 7, 2023, August 16, 2023, and August 24, 2023, DISH sent Massive Wireless and Akhtar a fourth, fifth, and sixth cease-and-desist letter via email. Pl.'s Rule 56.1 ¶¶ 106-10; Rich Decl., Exhibit K, Dkt. 45-11 ("July 7, 2026, Cease-and-Desist Letter"); *id.*,

Exhibit L, Dkt. 45-12 ("August 16, 2023, Cease-and-Desist Letter"); *id.*, Exhibit M, Dkt. 45-13 ("August 24, 2023, Cease-and-Desist Letter").

Massive Wireless and Akhtar contend that they only received two cease-and-desist letters. Defs.' Rule 56.1 ¶ 89. However, Massive Wireless admits that the mailing and email addresses that the notices were sent to were correct. Pl.'s Rule 56.1 ¶¶ 92, 99, 101; Akhtar Deposition Excerpts at 147, 149, 155. Massive Wireless and Akhtar did not respond to any of the cease-and-desist notices and continued to sell and promote the Service. Pl.'s Rule 56.1 ¶ 90. Massive Wireless and Akhtar have retained 40 to 50 deactivated set-top boxes and do not have any remaining credits of Rays TV service. *Id.* ¶ 56; Akhtar Deposition Excerpts at 114.

## LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 56(c)

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is one which "might affect the outcome of the suit under the governing law" but unnecessary or irrelevant factual disputes will be disregarded. *Id.* The moving party bears the burden of showing that they are entitled to summary judgment. *See id.* at 256; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir.

1996)).  The court's role is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir. 2000).  If the moving party meets its burden of demonstrating the absence of a disputed issue of material fact, then the burden shifts to the nonmoving party to present "specific facts showing a genuine issue for trial." *Sheet Metal Workers' Nat'l Pension Fund v. Accra Sheetmetal, LLC*, 993 F. Supp. 2d 245, 248 (E.D.N.Y. 2014).  In showing a genuine issue for trial, the nonmoving party cannot rely solely on "conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). If the evidence favoring the nonmoving party is "merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

### B.  Local Civil Rule 7.1(a)

Local Civil Rule 7.1(a) requires that all motions, oppositions, and replies include a memorandum of law "setting forth the cases and other authorities relied on in support of the motion."  "It is well settled that the 'failure to file a memorandum of law in opposition to the opposing party's motion is, by itself, a sufficient basis to grant the motion.'"  *Westchester Fire Ins. v. Annex Gen. Contracting, Inc.*, CV 14-5747 (JS) (AKT), 2016 WL 11481197, at *8 (E.D.N.Y. July 15, 2016 ) (quoting *Ismail v. Coney Island Hosp.*, 09-CV-2229 (CBA)(LB), 2010 WL 1292706, at *1 n.1 (E.D.N.Y. Mar. 31, 2010)) (collecting cases).  Although Massive Wireless and Akhtar did not respond to DISH's Motion with a memorandum of law and only responded with an affidavit by their counsel, *see generally* Opp'n, the Court proceeds to consider the merits of the Motion.  *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) ("Even unopposed motions for summary judgment must 'fail where the undisputed facts fail to show that

7

the moving party is entitled to judgment as a matter of law.'" (quoting *Vt. Teddy Bear Co. v. 1-900 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004))).

### C. Local Civil Rule 56.1 Statements

Local Civil Rule 56.1(b) requires that "[t]he papers opposing a motion for summary judgment . . . include a correspondingly numbered paragraph admitting or denying, and otherwise responding to, each numbered paragraph in the statement of the moving party." Massive Wireless and Akhtar did not file a response to DISH's Rule 56.1 as is required by Local Civil Rule 56.1(b). However, Massive Wireless and Akhtar did respond to DISH's proposed rule 56.1 statement when it moved for a pre-motion conference in anticipation of a motion for summary judgment. *See* Defs.' Rule 56.1 Resp. DISH's proposed Rule 56.1 statement to which Massive Wireless and Akhtar responded is identical to their Rule 56.1 statement currently before the Court in support of their Motion. *Compare* Pl.'s Rule 56.1*, with* Local Civil Rule 56.1 Statement of Material Facts as to Which There Is No Genuine Issue To Be Tried In Support of DISH's Motion for Partial Summary Judgment, Dkt. 25. Though it is not obligated to, the Court may consider "other materials in the record" when deciding the Motion. *See* Fed. R. Civ. P. 56(b)(3); *Westchester Fire Ins.*, 2016 WL 11481197, at *8 (E.D.N.Y. July 15, 2016). Accordingly, the Court includes Defendants' Rule 56.1 Response in its consideration of the undisputed facts.

Nonetheless, "'[w]here there are no citations or where the cited materials do not support the factual assertions in the Rule 56.1 statements, the Court is free to disregard the assertion,' and review the record independently." *Id.* at *8 (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73-74 (2d Cir. 2001)). Many of the assertions in Defendants' Rule 56.1 Response "deny knowledge or information of the truthfulness of the allegation" but fail to cite to the record. *See* Defs.' Rule 56.1 ¶¶ 2-4, 10-28, 39-34, 66-88, 94-97, 100, 102, 104, 106, 109-10, 119, 122. To the extent that

8

Massive Wireless and Akhtar do not cite to the record or cite to unsupportive materials,[3] the Court has reviewed the record independently to confirm whether there is a genuine dispute. Accordingly, the facts from the parties' Rule 56.1 statements are undisputed unless otherwise noted.

## DISCUSSION

DISH asserts three causes of action: direct copyright infringement against Doe Defendants, Compl. ¶¶ 56-64, and contributory copyright infringement and vicarious copyright infringement against Daud, Massive Wireless and Akhtar, *id.* ¶¶ 65-78. DISH moves for summary judgment against Massive Wireless and Akhtar, a permanent injunction enjoining Massive Wireless and Akhtar and any third parties acting in concert with them from further infringement and ordering them to destroy all remaining Rays TV set-top boxes in their possession pursuant to 17 U.S.C. § 503(c), and attorneys' fees and costs pursuant to 17 U.S.C. § 505. *See generally* Mot.

### A. Motion for Summary Judgment

DISH argues that the undisputed facts support a finding that (1) Doe Defendants are liable for direct copyright infringement; (2) Massive Wireless and Akhtar are liable for contributory copyright infringement; (3) Massive Wireless and Akhtar are liable for vicarious copyright infringement; (4) Massive Wireless and Akhtar's infringement was willful; and (5) DISH should be awarded attorney's fees and costs pursuant to 17 U.S.C. § 505. *See* Mot. at 1-3. Massive Wireless and Akhtar do not argue that there are any disputed facts as to the foregoing but argue that Akhtar was "scammed," "misled," and "lied to," by Daud, which caused Akhtar to sell about fifty Rays TV boxes. Opp'n ¶¶ 3-4, 9-10, 12.

---

[3] For example, Defendant's Rule 56.1 Response at Paragraph 41 cites to "Aktar Tr. 14 at 15 to 15 at 8" which is not included anywhere in the record.

### 1.  Direct Copyright Infringement

DISH asserts that, for the Court to find that Massive Wireless and Akhtar are secondarily liable, there must be a showing of direct infringement.  Mot. at 9.  DISH argues that it "has satisfied its burden of establishing direct copyright infringement by the Doe Defendants."  *Id.*  Massive Wireless and Akhtar do not respond to this argument.  *See generally* Opp'n.

To establish contributory copyright infringement, there must be a showing of direct or primary infringement of a third party.  *Arista Records LLC v. Lime Grp.*, 784 F. Supp. 2d 398, 423 (S.D.N.Y. 2011) (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 940 (2005)); *see Matthew Bender & Co. v. W. Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998).  The elements of direct copyright infringement are: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Abdin v. CBS Broadcasting Inc.*, 971 F.3d 57, 66 (2d Cir. 2020) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

### a.  Ownership of a Valid Copyright

DISH argues that it has an ownership interest in the copyrights for the Works, and thus is entitled to sue for infringement, because it "holds or has held the exclusive right to distribute and publicly perform the Works in the United States by means including satellite, OTT, IPTV, and the Internet, pursuant to signed, written agreements with the Networks."  Mot. at 10.  "[E]xclusive licenses are recognized as a type of ownership interest, conveying a particular exclusive right of copyright" and "[e]xclusive licensees may sue without joining the copyright owners."  *Davis v. Blige*, 505 F.3d 90, 99-100 n.10 (2d Cir. 2007) (first citing 17 U.S.C. § 101; and then citing 17 U.S.C. § 501(b)).  Thus, DISH has an ownership interest because it has an exclusive right to distribute and publicly perform the Works.

DISH also asserts that the Works are valid copyrights. Mot. at 10-11. Massive Wireless and Akhtar do not challenge the Works' validity. *See generally* Opp'n. There is a statutory presumption of validity if works are registered in the United States Register of Copyrights. 17 U.S.C. § 410(c); *Urbont v. Sony Music Ent.*, 831 F.3d 80, 88-89 (2d Cir. 2016) ("Production of a certificate of registration made before or within five years after first publication of the work constitutes prima facie evidence of the validity of the copyright."); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109 (2d Cir. 2001). One hundred and seventy of the Works are registered with the U.S. Register of Copyrights. Pl.'s Rule 56.1 ¶ 23; Certificates of Registration. These Works aired on the Channels between January 2021 and October 2023. Pl.'s Rule 56.1 ¶ 23. Thus, these Works are presumed to be valid. Furthermore, "proof of registration is not necessary if the work . . . originated in a country outside the United States that is a signatory to the Berne Convention for the Protection of Literary and Artistic Works ('Berne Convention')." *U2 Home Ent., Inc. v. Kylin TV, Inc.*, 06-CV-02770 (DLI)(RLM), 2007 WL 2028108, at *7 (E.D.N.Y. July 11, 2007). Here, the Works originated from either Egypt, Lebanon, Saudi Arabia, India, or Bangladesh. Pl.'s Rule 56.1 ¶ 18. These countries are parties to the Berne Convention. *See* WORLD INTELL. PROP. ORG., BERNE CONVENTION FOR THE PROTECTION OF LITERARY AND ARTISTIC WORKS, https://www.wipo.int/documents/d/treaties/docs-en-berne.pdf (last visited June 9, 2026). Accordingly, the Works that are not registered in the United States Register of Copyrights are nonetheless valid.

DISH further asserts that the Works are protected by the Copyright Act. Mot. at 10. Massive Wireless and Akhtar do not challenge the Works' protection. *See generally* Opp'n. The Copyright Act affords protection to non-United States works if: "(1) on the date of the first publication, one or more of the authors is a national, domiciliary, or sovereign authority of a treaty

party . . . or (2) the work is first published . . . in a foreign nation that, on the date of first publication, is a treaty party." 17 U.S.C. § 104(b). Because the countries from which the Works originate are parties to the Berne Convention, they are a "treaty party" under § 104(b), *see* 17 U.S.C. § 101, and are thus subject to protection.

Accordingly, DISH has established ownership of a valid copyright in the Works.

### b.  Copying of Constituent Elements

Next, DISH argues that it has met the second element of direct copyright infringement because the Service "infringes on DISH's exclusive rights under Section 106 of the Copyright Act to publicly perform the Works." Mot. at 11. Massive Wireless and Akhtar do not challenge DISH's assertion. *See, e.g.*, Opp'n ¶ 4 ("It is true that my store did sell these boxes that turned out to contain infringing material."). "To satisfy the second element, a plaintiff 'must demonstrate that: (1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's [work].'" *Abdin*, 971 F.3d at 66 (alterations in original) (quoting *Yurman Design*, 262 F.3d at 110). Copying means to infringe on "any of the copyright owner's five exclusive rights described in [17 U.S.C.] § 106." *Arista Records, LLC v. Doe*, 604 F.3d 110, 117 (2d Cir. 2010) (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001)). 17 U.S.C. § 106 grants copyright owners the right "to distribute copies . . . of the copyrighted work to the public by sale or other transferer of ownership, or by rental, lease, or lending" and "to perform the copyrighted work publicly." 17 U.S.C. §§ 106(3)-(4).

Here, the Service transmits the Channels displaying the Works from servers maintained by the Doe Defendants to Service Users, Pl.'s Rule 56.1 ¶¶ 13, 33, which constitutes "copying" in direct infringement of a copyright owner's right to distribute or publicly perform the work, *see*

*Am. Broad. Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431, 451 (2014) (holding that the provider of centralized equipment used to stream broadcast programming to its subscribers infringed content owners' right of public performance); *cf. DISH Network, L.L.C. v. Kumar*, 21-CV-6730 (JPO), 2022 WL 5108085, at *2 (S.D.N.Y. Oct. 4, 2022) (finding operators of a pirate television service liable for direct infringement of DISH's exclusive distribution and public performance rights). Since the Service "actually copies" the Works, it is indisputable that there is "substantial similarity" between the works streamed by the Service and the Works themselves.

Accordingly, DISH has established that constituent elements of the Works that are original were copied, and consequently, the Service directly infringes on DISH's copyright in the Works.

### 2. Secondary Liability for Copyright Infringement

Having established direct infringement of DISH's copyright interest in the Works, the Court now turns to whether Massive Wireless and Akhtar are secondarily liable for copyright infringement. There are two types of secondary liability for copyright infringement: contributory liability and vicarious liability. *Grokster.*, 545 U.S. at 930.

### a. Contributory Copyright Infringement

DISH argues that "[t]he undisputed facts establish that Massive Wireless and Akhtar are jointly and severally liable for contributory copyright infringement." Mot. at 12. "One who, with knowledge of the infringing activity, *induces,* causes *or materially contributes to the infringing conduct of another,* may be held liable as a 'contributory' infringer." *Arista Records v. Doe*, 604 F.3d at 117 (quoting *Gershwin Publ'g. Corp. v. Columbia Artists Mgmt.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). Furthermore, "[a]ll persons and corporations who participate in, exercise control over, or benefit from the infringement are jointly and severally liable as copyright infringers." *Sygma Photo News, Inc. v. High Soc'y Mag., Inc.*, 778 F.2d 89, 92 (2d Cir. 1985) (footnote omitted).

13

Considering the foregoing, the standard for contributory infringement can be broken down into two prongs: "the 'knowledge' prong and the 'material contribution' prong." *Faulkner v. Nat'l Geog. Soc.*, 211 F. Supp. 2d 450, 473 (S.D.N.Y. 2002), *aff'd* 409 F.3d 26 (2d Cir. 2005). DISH argues that the facts undisputedly establish both. *See* Mot. at 12-16.

### i.   Knowledge

DISH argues that Massive Wireless and Akhtar "were fully aware that their sales, promotion, and marketing of the [Service] infringed DISH's copyrights." Mot. at 12. Akhtar represents that Daud told him that DISH's notices were "nothing to worry about." Opp'n at ¶ 8. "[C]ontributory infringement liability is imposed on persons who 'know or have reason to know of the direct infringement.'" *Arista Records v. Doe*, 604 F.3d at 118 (quoting *Napster*, 239 F.3d at 1020); *see also Faulkner*, 211 F. Supp. 2d at 474 (explaining that the knowledge prong "is satisfied if the defendant 'knew or should have known' of the infringing activity at the time of its material contribution"). "[R]eckless disregard or '[t]urning a blind eye to infringement' may constitute knowledge and be inferred from the defendant's conduct." *Broadcast Music, Inc. v. JJ Squared Corp.*, 11–CV–5140 (JFB)(AKT), 2013 WL 6837186, at *6 (E.D.N.Y. Dec. 26, 2013) (first quoting *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 154 (S.D.N.Y. 2009); and then citing *Knitwave, Inc. v. Lollytogs, Ltd.*, 72 F.3d 996, 1010 (2d Cir. 1995)).

DISH argues that Massive Wireless and Akhtar had actual knowledge of the direct infringement because of the six cease-and-desist letters that DISH sent to them between August 2017 and August 2023. Mot. at 13-14. Akhtar acknowledges that he "received a letter from an attorney informing the company that [he] was infringing upon the copyrights." Opp'n ¶ 7. He asserts that Daud told him that the letter was a "scam and to ignore it as he was complete[ly] licensed to the content of the boxes" and assured him "that there was nothing to worry about and

14

to continue selling the boxes." *Id.* ¶ 8. Further, Massive Wireless and Akhtar only admit that they received two of the six cease-and-desist letters and did not receive the notices DISH sent in August 2017 and July 2021. Defs.' Rule 56.1 ¶¶ 89, 91. Nonetheless, Massive Wireless and Akhtar continued to sell the Service after receiving the cease-and-desist letters, *id.* ¶¶ 55, 90, and only "removed all indicia of TV boxes from the business" "as soon as the complaint came in," Opp'n ¶ 11.

There is no genuine dispute of material fact that Akhtar and Massive Wireless received the six cease-and-desist letters. Akhtar's denial of receipt of the cease-and-desist letters is controverted by Massive Wireless' and Akhtar's admissions that their email address was the correct address for Massive Wireless when the August 23, 2017, Cease-and-Desist Letter was emailed to it. Pl.'s Rule 56.1 ¶¶ 92-93. It is also controverted by the U.S. Postal Service green cards proving that the August 23, 2017, and July 27, 2021, Cease-and-Desist Letter were delivered to Massive Wireless via Certified Mail. *Id.* ¶¶ 96, 102. "A presumption of receipt of mail arises . . . on sufficient evidence of 'uncontroverted United States Postal Service records'" and "[d]enial of receipt, without more, is insufficient to rebut the presumption." *Gustavia Home, LLC v. Rice*, 16 Civ. 2353 (BMC), 2016 WL 6683473, at *3 (E.D.N.Y. Nov. 14, 2016) (second alteration in original) (quoting *Akey v. Clinton County*, 375 F.3d 231, 235 (2d Cir. 2004)). Massive Wireless and Akhtar have failed to rebut this presumption and therefore, the Court presumes their receipt of the six cease-and-desist letters.

"In weighing the knowledge requirement, courts consider evidence of actual and constructive knowledge, including cease-and-desist letters, officer and employee statements, promotional materials, and industry experience." *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 658 (S.D.N.Y. 2013) (concluding that a website operator was aware of its users'

infringement in part because it was sent a cease-and-desist letter advising that its website violated copyrights); *cf. Hartmann v. Popcornflix LLC*, 690 F. Supp. 3d 309, 320 (S.D.N.Y. 2023) (dismissing contributory infringement claim in part because the plaintiff made "no allegation that it sent 'cease-and-desist letters' or that there were other traditional indicia of actual or constructive knowledge" (quoting *ReDigi*, 934 F. Supp. 2d 658)). The Court finds, as have other courts in this Circuit, that receipt of cease-and-desist letters is sufficient to establish actual knowledge of infringement for the purposes of default judgment. *See DISH Network L.L.C. v. 786 Wireless World, Inc.*, 21 CV 5730 (AMD)(RML), 2024 WL 708229, at *5 n.2 (determining that the amended complaint established each element of contributory infringement because each defendant had actual knowledge of their infringement because they received at least 63 cease-and-desist notices from DISH), *report & recommendation adopted*, 21-CV-5730 (AMD)(RML), 2024 WL 1092498 (E.D.N.Y. Mar. 13, 2024); *Kumar*, 2022 WL 5108085, at *2 ("Defendants demonstrated their willfulness and actual knowledge that their acts constituted infringement of DISH's exclusive rights by continuing the acts . . . even after receiving cease and desist letters from DISH.").

Here, DISH sent cease-and-desist letters that informed Massive Wireless and Akhtar that their "promotion and sale of set-top boxes and services that are distributing the Channels constitutes secondary copyright infringement" and demanded that they "take immediate action to cease all infringement of DISH's rights, including without limitation, by ceasing to distribute, sell, provide, or promote Rays IPTV, Glo TV, and all set-top boxes and services that distribute DISH's Channels in the United States." May 5, 2023, Cease-and-Desist Letter at 3; *see also* July 7, 2023, Cease-and-Desist Letter at 1 ("NAGRA has evidence that the service Rays TV is unlawfully distributing and/or publicly performing the Protected Content by enabling users to access unlawful and unauthorized streams (the 'Unauthorized Streams') of the Protected Content."); August 16,

16

2023, Cease-and-Desist Letter at 1 (same); August 24, 2023, Cease-and-Desist Letter at 1 (same). Regardless of whether Daud informed Akhtar that he did not need to worry about the cease-and-desist letters, willful blindness or objective knowledge is sufficient to show knowledge of infringement. *See Broadcast Music*, 2013 WL 6837186, at *7; *ReDigi*, 934 F. Supp. 2d at 659. Accordingly, Massive Wireless and Akhtar were put on notice by the cease-and-desist letters that the Rays TV was infringing on DISH's copyright and knew or should have known of infringement by the Doe Defendants and Service. *Cf. TVB Holdings (USA), Inc. v. HTV Int'l Ltd.*, 16-CV-1489 (DLI)(PK), 2018 WL 7076022, at *5 (E.D.N.Y. Mar. 9, 2018) ("Defendant's knowledge of the infringing activity is clearly established in its acknowledgement of the receipt of the 'cease and desist letter' from Plaintiffs."); *Usenet.com*, 633 F. Supp. 2d at 155 (reasoning that the defendants knew or should have known of the infringement by its users because they were "explicitly put on notice of the existence of thousands of copies of [the plaintiffs'] copyrighted sound recordings available on its service").

### ii. Material Contribution

DISH argues that "Massive Wireless and Akhtar both materially contributed to the infringement of the Works." Mot. at 14. Massive Wireless and Akhtar do not offer any defenses to this argument. *See generally* Opp'n. Material contribution may be established by showing that the defendant "encourage[d] or assisted others' infringement, or provided machinery or goods that facilitated infringement." *Lime Grp.*, 784 F. Supp. 2d at 432; *see also Matthew Bender*, 158 F.3d at 706 ("Two types of activities that lead to contributory liability are: (i) personal conduct that encourages or assists the infringement; and (ii) provision of machinery or goods that facilitate the infringement."). Further, "the alleged contributory infringer must have made more than a mere quantitative contribution to the primary infringement: in other words, the participation or

contribution must be substantial." *Usenet.com*, 633 F. Supp. 2d at 155 (quoting *Faulkner*, 211 F. Supp. 2d at 473); *see also EMI Christian Music Grp. v. MP3tunes, LLC*, 844 F.3d 79, 100 (2d Cir. 2016) (explaining that the phrases "materially contributes" and "substantially contributes" in this context are synonymous). DISH argues that Massive Wireless and Akhtar encouraged or assisted infringement and also provided the machinery or goods to facilitate the infringement. Mot. at 14.

DISH asserts that Massive Wireless and Akhtar "knowingly facilitated in the infringement of the Works by selling and distributing set-top boxes preloaded with the [Service]." *Id.* The material contribution requirement is met "where a defendant provides the 'site and facilities' or the 'environment and market' for the infringing activity." *Usenet.com*, 633 F. Supp. 2d at 155 (finding that the defendants' operation of computer servers to store and distribute content to subscribers via music file downloads "created the 'site and facilities' that their subscribers use[d] to directly infringe copyrights"); *cf. TVB Holdings*, 2018 WL 7076022, at *5 (finding the material contribution prong was met because the defendant manufactured and distributed set-top box devices and controlled the set-top box app stores and apps, thereby providing the "site and facilities or the environment and market for infringing activities"). Massive Wireless admits that it, with the purpose of enabling customer access to the Service, sold set-top boxes preloaded with the Service and with a one-year subscription to the Service. Pl.'s Rule 56.1 ¶¶ 49-50, 54; *see also* Opp'n ¶¶ 3-4. Further, the reseller panel allowed Akhtar to activate or deactivate customers' access to the Service. Pl.'s Rule 56.1 ¶¶ 113-18. In doing so, Akhtar and Massive Wireless provided the mechanisms for Service Users to access and view the Works and therefore materially contributed to the infringing activity.

Next, DISH argues that Akhtar is personally liable for contributory infringement because as CEO, "Akhtar personally sold Rays TV set-top boxes and subscriptions to the [Service] to

18

Massive Wireless customers." Mot. at 15-16. A corporate officer can be held personally liable for copyright infringement "if the officer is a moving, active, conscious force behind [the defendant corporation's] infringement." *Mattel, Inc v. Robarb's, Inc.*, 00 Civ. 4866(RWS), 2001 WL 913894, at \*8 (S.D.N.Y. 2001) (alteration in original) (quoting *Monsanto Co. v. Haskel Trading, Inc.*, 13 F. Supp. 2d 349, 354 (E.D.N.Y. 1998) (determining that the president of the infringing company was jointly and severally liable because he "took an active role in preparing the inserts for the market, including conceiving of the product and the design of the inserts, conferring with sales associates and outside professionals, and consulting with an attorney."). Akhtar took a personal role in ordering and selling the set-top boxes, marketing the Service on his business card, and promoting subscriptions of the service with the sale of the set-top boxes. *See* Pl.'s Rule 56.1 ¶¶ 41, 48-49, 63. Accordingly, Akhtar is personally liable for contributory infringement.

### b. Vicarious Copyright Infringement

DISH asserts that "Massive Wireless and Akhtar are also jointly and severally liable for vicariously infringing the Works." Mot. at 16. Massive Wireless and Akhtar do not raise a defense to this assertion. *See generally* Opp'n. "One . . . infringes vicariously by profiting from direct infringement while declining to exercise the right to stop or limit it." *Grokster*, 545 U.S. at 914; *see also Gershwin*, 443 F.2d at 1162 ("[O]ne may be vicariously liable if he has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities.").

### i. Financial Benefit

DISH argues that "Massive Wireless and Akhtar derived direct financial benefit from the [Service]." Mot. at 17. Evidence of direct financial benefit from infringement may include a showing that the defendant's revenues increased depending on the volume of infringing activity

and that the infringing content acted "as a draw" for users to subscribe to the defendant's service. *See Usenet.com*, 633 F. Supp. 2d at 156. Here, Massive Wireless generated revenues of up to $240 per box from its sales of the set-top box, Service, and subscription, and Akhtar received all of the profits generated by Massive Wireless. Pl.'s Rule 56.1 ¶¶ 111-12; Akhtar Deposition Excerpts at 107. Akhtar acknowledges that Massive Wireless "did sell these boxes that turned out to contain infringing material making an approximate $5,000.00 in gross proceeds therefrom." Opp'n ¶ 4. Thus, it is undisputed that Massive Wireless' revenues and Akhtar's profit increased with the volume of sales of the Service. There is also evidence that the Service was a draw for Massive Wireless customers. For instance, a number of the Channels originate from Bangladesh, Pl.'s Rule 56.1 ¶ 60, and Major Wireless' "major customers are Bangladeshi, and they look for Bangladeshi channels" so the sale of the Service "happened very naturally," Akhar Deposition Excerpts at 77. Though not entirely conclusive of financial benefit, *see Usenet.com*, 633 F. Supp. 2d at 157 (noting that the draw need not be primary or significant only "a" draw), the customers' interest in the Service lends further support to a finding of derived direct financial benefit. Accordingly, there is no dispute that Massive Wireless and Akhtar earned a direct financial benefit from the infringement.

### ii. Right and Ability to Stop

DISH also argues that "Massive Wireless and Akhtar had the right and ability to stop the infringement at any time." Mot. at 17. A defendant need not have "formal power to control," but if it is "in a position to police the infringing conduct," it may be found vicariously liable. *See Gershwin*, 443 F.2d at 1163; *see also Usenet.com*, 663 F. Supp. 2d at 157 ("[T]he ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." (quoting *Napster*, 239 F.3d at 1023)). Here, it is undisputed that Massive

20

Wireless and Akhtar had access to and personally used the reseller panel to control the activation status of customers' subscriptions to the Service. Pl.'s Rule 56.1 ¶¶ 113-20. Thus, they had the right and ability to control Service Users' access to the infringing Service and police the infringing conduct by deactivating Service Users' access at any time.

DISH further argues that Akhtar's "total control over Massive Wireless and deep personal involvement" makes him individually vicariously liable for infringement. Mot. at 17-18. "Even if a copyright is not infringed by a corporate officer's own hand, a corporate officer with an obvious and direct financial interest, and a power of supervision to effect an infringement, may be vicariously liable." *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 322 (2d Cir. 2022) (citing *EMI Christian Music*, 844 F.3d at 99), *cert. denied*, 144 S. Ct. 77 (2023). Indeed, it is undisputed that Akhtar is the CEO and president of Massive Wireless and thus has control over Massive Wireless. Pl.'s Rule 56.1 ¶ 8; Opp'n ¶ 1; *see J&J Sports Prods., Inc. v. Ahuachapan Corp.*, 422 F. Supp. 3d 652, 659 (E.D.N.Y. 2019) ("It is hard to imagine a CEO without control over his or her company." (citing *Wansdown Props. Corp., N.V. v. Azari*, 165 A.D.3d 537, 539 (1st Dep't 2018)).

Taken together, the undisputed facts show that Massive Wireless and Akhtar had the right and ability to supervise the infringing activities. Accordingly, Massive Wireless and Akhtar are vicariously liable for the infringement of the Works.

### 3. Willfulness

DISH seeks to recover statutory damages[4] and presently moves for summary judgment against Massive Wireless and Akhtar on the issue of willfulness. Mot. at 18. Massive Wireless and Akhtar do not address the issue of recovery of statutory damages. *See generally* Opp'n.

---

[4] At the Court's direction, *see* Minute Entry, dated Apr. 29, 2024, DISH anticipates moving for default judgment against Defendants Rays IPTV and Daud, and as a part of that motion, to hold all four Defendants jointly and severally liable for statutory damages for willful infringement of the 170 registered Works. Mot. at 2, 8 n.6, 18. Therefore, the Motion only seeks summary judgment as to Massive Wireless and Akhtar's willfulness.

21

"Should the copyright owner choose to recover statutory damages, the burden falls on her to prove that the infringement is willful." *Otto v. Hearst Commc'ns, Inc.*, 345 F. Supp. 3d 412, 435 (S.D.N.Y. 2018) (citing 17 U.S.C. § 504(c)(1)). "To determine whether infringement was willful, '[t]he standard is simply whether the defendant had knowledge that its conduct represented infringement or perhaps recklessly disregarded the possibility.'" *Hudson Furniture, Inc. v. Mizrahi*, 1:20 Civ. 04891 (PAC), 2023 WL 6214908, at *17 (S.D.N.Y. Sep. 25, 2023) (quoting *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1382 (2d Cir. 1993)); *see also Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 F. App'x 26, 31 (2d Cir. 2013) ("To prove willfulness, a 'plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard or willful blindness.'" (quoting *Island Software & Comput. Serv. Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005))). To evaluate an infringer's state of mind, courts consider factors like "whether the infringer was on notice that the copyrighted work was protected, whether the infringer had received warnings of the infringements, as well as whether the infringer had experience with previous copyright ownership, prior lawsuits regarding similar practices, or work in an industry where copyright is prevalent." *Marshall v. Marshall*, 08 CV 1420(LB), 2012 WL 1079550, at *25 (E.D.N.Y. Mar. 30, 2012) (citations omitted). It is permissible to grant summary judgment on willfulness "where there are sufficient undisputed material facts on the record to make the question appropriate for summary judgment." *Hudson Furniture*, 2023 WL 6214908, at *17 (quoting *Upton v. Nature Co.*, 71 F.3d 464, 472 (2d Cir. 1995)).

As discussed above, it is undisputed that Massive Wireless and Akhtar received six cease-and-desist letters warning of their infringement and knew or should have known that their conduct was infringing on DISH's copyrights. Massive Wireless and Akhtar also refused to cease their

22

infringing conduct despite being on notice of infringement.  *See* Pl.'s Rule 56.1 ¶¶ 55, 90; *see also Fendi Adele*, 507 F. App'x at 31 (affirming the district court's grant of summary judgment on willfulness because the defendant was "clearly on notice that it might be infringing trademarks" after the receipt of a cease-and-desist letter and multiple lawsuits filed by other designers but failed to adequately inquire about the authenticity and sources of the goods it purchased).

Accordingly, DISH is granted summary judgment on the issue of Massive Wireless' and Akhtar's willfulness.

### B.  Motion for Permanent Injunction

DISH moves for a permanent injunction in the form of an order enjoining Massive Wireless and Akhtar and any third parties acting in concert with them from further infringement and ordering them to destroy all remaining Rays TV set-top boxes in their possession pursuant to 17 U.S.C. § 503(b).  *See* Mot. at 3.  Massive Wireless and Akhtar do not respond to DISH's motion for a permanent injunction.  *See generally* Opp'n.

The Copyright Act endows courts with the power to issue "final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a).  To obtain a permanent injunction, a plaintiff must show (1) an irreparable injury; (2) the inadequacy of remedies available at law, such as monetary damages; (3) that, considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  The Court takes each element in turn.

First, DISH argues that Massive Wireless and Akhtar have caused irreparable harm to DISH.  Mot. at 24.  Based on the fact that proving "the loss of sales due to infringement is . . . notoriously difficult" "irreparable harm has been readily found in copyright infringement

cases." *786 Wireless World, Inc.*, 2024 WL 708229, at *9 (first quoting *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010); and then citing *Disney Enters., Inc. v. Merchant*, 6:05-CV-1489, 2007 WL 1101110, at *6 (N.D.N.Y. Apr. 10, 2007)).

This case is similar to *786 Wireless World*, where the court recommended that a permanent injunction issue against the defendants, determining, *inter alia*, that the defendants caused DISH irreparable injury by causing lost market share and price erosion, disrupting relationships, depriving DISH of its exclusive rights, and interfering with DISH's ability to develop a lawful market for its programming. *Id.* at *9. There, the defendants intercepted television programing originating from India and Pakistan and provided that pirated programming, without authorization, to viewers via set-top boxes and other devices. *Id.* at *1. Here, too, Massive Wireless and Akhtar distributed or publicly performed the Works by distributing the Rays TV set-top boxes, which caused irreparable harm by directly competing with authorized subscriptions to DISH's television programming, thereby causing lost market share and price erosion for legitimate services, disrupting DISH's relationships with authorized distributors, depriving DISH of its exclusive rights to control the distribution and quality of the copyrighted programming, and interfering with DISH's ability to develop a lawful market for the programing in the United States. Pl.'s Rule 56.1 ¶ 34; *cf. WPIX, Inc. v. IVI, Inc.*, 691 F.3d 275, 285-87 (2d Cir. 2012) (affirming the district court's finding that the plaintiffs would suffer irreparable harm without a preliminary injunction because the defendant's retransmissions of the copyrighted material over the internet would "substantially diminish the value of the programming," the plaintiffs' "losses would be difficult to measure and monetary damages would be insufficient to remedy the harms," and the defendant "would be unable to pay damages should [the] plaintiffs prevail"). Therefore, DISH has demonstrated irreparable harm.

Next, DISH argues that the remedies at law are inadequate to compensate it for its injuries because Massive Wireless admits to retaining dozens of set-top boxes preloaded with the Infringing Service and there is thus "little doubt" that "Massive Wireless and Akhtar will continue their infringing activities." Mot. at 24. While Massive Wireless admits to retaining 40 to 50 "deactivated" set-top boxes, it does not have any credits to purchase the Service from Daud, Akhtar Deposition Excerpts 3 at 114, which creates some doubt as to whether Massive Wireless and Akhtar will continue their infringing activities. Yet, barring injunctive relief, there is nothing to stop Massive Wireless and Akhtar from reactivating the set-top boxes and purchasing additional credits to the Service. *See Rosco, Inc. v. Mirror Lite Co.*, 96-CV-5658 (CPS), 2006 WL 2844400, at *4 (E.D.N.Y. Sep. 26, 2006) ("Cessation of production and sales is not in and of itself sufficient 'sound reason' to deny a permanent injunction. . . . Rather, the request for an injunction should be denied only when 'the evidence is very persuasive that further infringement will not take place.'" (quoting *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1282 (Fed. Cir. 1988))); *Dentsply Int'l Inc. v. Omni Dental Supply Inc.*, CV-08-1931 (RRM)(SMG), 2009 WL 10706585, at *3 (E.D.N.Y. Oct. 12, 2009) (collecting cases). Thus, DISH has demonstrated inadequate remedies at law.

Further, DISH argues that the balance of hardships and public interest favor an injunction because Massive Wireless and Akhtar have "no legitimate interest in continuing the infringement" and thus will not be harmed by an injunction enjoining them from doing so. Mot. at 24-25. The Court agrees. *See 786 Wireless World*, 2024 WL 708229, at *10 ("[R]equiring defendants to cease infringing DISH's exclusive rights in copyrighted television programming will not harm defendants because they have no legitimate interest in continuing the infringement."). Further, "the public has a compelling interest in protecting copyright owners' marketable rights to their

25

work and the economic incentive to continue creating television programming." *WPIX Inc.*, 691 F.3d at 287. Therefore, DISH has established the last two elements to satisfy the need for a preliminary injunction.

Finally, DISH argues that "Massive Wireless admits that it has retained 40-50 Rays TV set-top boxes" and should be ordered to destroy those boxes and confirm it has done so. Mot. at 25. The Copyright Act "authorizes courts to order the destruction of infringing products." *Malibu Media, LLC v. Baker*, 18-CV-3263 (JGK) (BCM), 2020 WL 3978302, at *7 (S.D.N.Y. June 18, 2020) (citing 17 U.S.C. § 503(b)), *report & recommendation adopted,* 18-CV-3263 (JGK), 2020 WL 3972736 (S.D.N.Y. July 13). Since DISH has met the requisite elements to justify issuance of a permanent injunction, its request for an order requiring Massive Wireless and Akhtar to destroy the remaining set-top boxes in their possession is granted. *See id.* at *8.

Accordingly, DISH's motion for a permanent injunction and order requiring Massive Wireless and Akhtar to destroy the remaining set-top boxes in their possession is granted.

## C. Attorney's Fees and Costs

DISH seeks an award of its reasonable costs and attorneys' fees incurred in this action from Massive Wireless and Akhtar pursuant to 17 U.S.C. § 505 and seeks leave to file a petition detailing the exact amounts of its reasonable attorneys' fees and costs if the Court finds that an award is appropriate. Mot. at 20. Massive Wireless and Akhtar do not respond. *See generally* Opp'n. The Court grants DISH leave to file a motion for attorney's fees and costs.

## CONCLUSION

For the foregoing reasons, DISH's motion for partial summary judgment and for a permanent injunction is GRANTED, with a permanent injunction order to follow.

DISH is GRANTED leave to file a motion for attorneys' fees and costs, and the Court sets the following briefing schedule on said motion:

DISH shall serve its moving papers on Defendants by July 3, 2026;

Defendants shall serve their opposition by August 3, 2026; and

DISH's reply, if any, to be served and fully briefed motion shall be filed by August 10, 2026.

SO ORDERED.

_____/s/_____

ORELIA E. MERCHANT
United States District Judge

June 9, 2026
Brooklyn, New York

27